## No. 9600.

## J. H. MAURY & Co. vs. LOUIS RANGER & Co.

Jurisprudence has discarded the former stringent rule which made agents of foreign principals personally liable on contracts executed by them in that capacity, without any distinction whether they describe themselves in the contract as agents or not.

In suits against agents to make them thus responsible, courts must endeavor to ascertain from the nature and tenor of the contract, to which of the parties credit was given, and, they will be guided by the rule that the agent of a foreign principal is not, as a question of law, personally liable on every contract made for his principal. It is rather a question of fact in each case, to be ascertained by the terms of the particular contract and the surrounding circumstances.

To avoid personal liability on a contract made for his principal, the agent must disclose his agency as well as his principal, either at the time that the contract is entered into or when he is sued as personally liable thereon.

In a contract of affreightment which contains on its face the fact of the agency and discloses by its terms the principal for whom it is executed, the agent will be exonerated from personal liability.

A PPEAL from the Civil District Court for the Parish of Orleans. *Tissot*, J.

---

*Farrar & Kruttschnitt* for Plaintiffs and Appellees:

1. The agents of merchants residing in a foreign country, or in another State, are personally liable, whether they describe themselves as agents or not in the contract. In such cases it is presumed that the credit is given exclusively to them to the exoneration of their employers; but the presumption may be rebutted by proof that the credit was

given to both, or to the principal only. Newcastle vs. Red River R. R. Co., 1 Rob. 147; Thorne vs. Tait et als., 8 Ann. 8; Adler vs. Shuchardt, 8 Am. L. R. 15; Wharton on Agency, secs. 514 and 791; Dos Passos on Stock Brokers and Stock Exchanges, p. 680; Story on Agency, § 268.

, 2. Where an agent fails to disclose the name of his principal, he is bound personally. C. C. 3012; Bedford. Breedlove & Robeson vs. Jacobs, 4 N. S. 529; Nott & Co. vs. Papet, 15 La. 310; Parlange vs. Faures, 14 Ann. 444; Story on Agency, § 267; Kent's Commentaries, 13th ed., vol. 2 (top paging), 631.

3. If a person would excuse himself from responsibility on the ground of agency, he must show that he disclosed his principal at the time of making the contract, and that he acted on his behalf, so as to enable the party with whom he deals to have recourse to the principal in case the agent has authority to bind him. Defendants' brief, p. 32.

4. It is elementary in the law of carriers that the goods to be transported must be received by the carrier before his liability commences. Hunt & Macauley vs. Mississippi Central R. R. Co., 39 Ann. 446.

## *D. C. & L. L. Labatt* for Defendants and Appellants:

1. An agent acting within authority, who signs bills of lading in his principal's name, without any personal guarantee, and free from unfaithfulness, fraud or neglect, is not liable, personally, to the shipper, even for the admitted breach of such contract by his principals.

2. Where a written contract of affreightment is entered into by the master of a ship, and contains all the stipulations of the parties, conditioned on her arrival at a named port, and the ship is prevented from reaching her wharf by "force majeure," the contract is annulled, without liability for damages on either side; and *a fortiori*, the acknowledged agent of the ship, its consignee and husband, who was warranted by custom of the port in anticipating her arrival, and to prepare for her prompt dispatch by receiving the cargo on the levee, cannot be pursued personally for an alleged breach, simply because the principals are foreigners and reside "beyond seas."

3. An agent or consignee of a ship, duly authorized, whose owners are domiciled abroad. is no more personally liable for damages incurred by violation of a contract, than if he were the agent of a principal in another State of the Union, unless credit is exclusively given to the agent to the exoneration of the principal or upon the agent's personal guarantee. But where he has disclosed the name of his principal in the contract, or at the trial, he incurs no personal liability. 15 L. R. 306; 15 Ann. 189; 14 Ann. 444; 4 N. S. 430.

4. When a contract of affreightment or charter-party is annulled by *vis major*, the voyage is broken up and all parties are at arm's-length, and the relation of the ship, master and owners, who, in anticipation of her arrival, received cargo on the levee, must be governed by the law of *negotiorum gestor*, and *ipso facto* they become agents of the shipper, to forward it at the best rate of freight obtainable, unless the agents can control another ship of the same line under the clause of "liberty to tranship."

5. Where the cargo is forwarded by another steamer, of a different line, under the spur of the shipper's request or instruction, but at a higher rate of freight than that of the ruptured contract, which the shipper knew, or was bound to expect, as the result of the "quarantine blockade," the difference is a damage *absque injuria*, and must fall on the owner of the cargo, under the rule of "*res perit domino*," especially where all the charges, trouble and expenses of shipment were borne by the disabled ship, without reimbursement.

6. Where the agent gives to the other party a substantial principal, who recognizes and ratifies the contract and properly discharges obligations resulting therefrom, with the best intentions and in the interest of the shipper, and without compensation, he is free from personal liability, and requires no express stipulation to relieve or to rebut the presumption that the contract was made with him personally. 7 Ann. 674.

7. Such an agent cannot be held responsible personally, merely because his principals are foreigners and reside "beyond seas," or in another State, in the face of a written contract negativing the intention to bind themselves personally for its violation, or that credit was exclusively given to him to the exoneration of his principal. 15 L. R. 310 and Story on Agency, §§ 265, 267.

8. The civil law of mandate in Louisiana cannot yield to the "custom of trade in London," in specified transactions, the common law or the commercial law of other countries (in sales of personal property), if the agent discloses his mandate and designates his principals, by written contract, without personal guarantee.

9. The shipper paying the freight by the substituted ship, is in no worse position than if the original ship had paid the freight in Liverpool on its delivery, and then sued plaintiff to reimburse the amount expended or incurred as "*negotiorum gestor.*" Plaintiffs only did what the law would have obliged them to do, and ought not to complain against anybody.

10. The "liberty to tranship" clause is not meant to obligate the master, owners or agent to ship by a vessel of another line, or incur loss; but is a privilege inserted to earn freight, *pro rata itineris,* or to forward by another vessel of the same line. 23 Fed. Rep. No. 16, p 918, June, 1885.

The opinion of the Court was delivered by

Poché, J. Plaintiffs seek to hold the defendants personally liable under a contract of affreightment which the latter had executed as agents.

The principal defense is that the defendants acted throughout the transactions which form the basis of this suit, merely as agents of the owners of the vessel in whose name they had signed bills of lading, and that they are not personally liable to plaintiffs under the contract declared upon. They prosecute this appeal from a judgment in favor of plaintiffs for the full amount of their claim.

The pertinent facts in the record are as follows:

In July, 1883, the defendants executed bills of lading to plaintiffs for 2709 bales of cotton, to be received on board of the steamer "Gracia," then on her way to this city, and consigned to Liverpool, England, at the rate of 19-64 of a penny sterling per pound. That under the effect of the quarantine then established by the State authorities at the mouth of the Mississippi river, the vessel "Gracia" was not allowed to reach the port of New Orleans, whereupon defendants, with the knowledge and consent of plaintiffs, shipped the cotton to Liverpool by the steamer "Chancellor," owned by a different line of steamers.

The bill of lading issued by the latter steamer was to the steamer "Gracia," but it called for freight at the rate of ⅝ of a penny, which was exacted from the consignees at Liverpool before delivery of the cotton by the "Chancellor." It also appears that on delivery, some of the cotton was found damaged, for which the shippers were charged the sum of 118 pounds sterling.

·The demand of plaintiffs is for the difference of freight charges on the cotton at the rate of 19-64 of a penny per pound and the charges exacted at the increased rate of ⅜ of a penny, and for the amount paid by them on account of the damaged cotton, the whole amounting in our currency to $2,977.10.

Plaintiffs' theory, which was adopted by our learned brother of the district court, under which they propose to make the defendants personally liable, presents two propositions of law:

1st. The agents of merchants residing in a foreign country, or in another State, are personally liable, whether they describe themselves as agents or not in the contract. In such cases it is presumed that the credit is given exclusively to them to the exoneration of their employers; but the presumption may be rebutted by proof that the credit was given to both, or to the principal only.

2d. Where an agent fails to disclose the name of his principal, he is bound personally.

While our appreciation of the facts in this case would justify the conclusion that the defendants would be exonerated even under the stringent and narrow rule contained in plaintiffs' first proposition, we prefer to rest our conclusions on other grounds, and to withhold our sanction of a principle which once prevailed in some English courts, but which has long since been repudiated by more progressive and enlightened jurisprudence, not excluding English tribunals.

The rule was formulated by Judge Story in his work on Agency, predicated on some adjudications in the jurisprudence of England, but he lived long enough to appreciate its harshness and its damaging effect on international commercial intercourse, which was subsequently encompassed in more liberal ties, and became in time immeasurably increased and facilitated by the application of steam to navigation on the seas, the invention of the electric telegraph, and the multiplicity of railroad communications. Hence, we find him in the revision of his work yielding a cheerful compliance with modern adjudications on the subject-matter, by the following material modification of his views as originally enunciated: "And probably the better rule is that the agent of a foreign principal is not, as a question of law, personally liable on every contract made for his principal. It is rather a question of fact in each case, a question of intention, to be ascertained by the terms of the particular contract and the surrounding circumstances." Story on Agency, 6th ed., § 268.

In the next section, 268 "a," the learned author adds another very wise and very significant qualification to the rule in the following words:

"This presumption of credit being given alone to the agent, and not to the foreign principal, applies with the most force to purchases made by an agent for a foreign principal; but when a written contract is made, and expressed to be with a foreign principal and not with the agent, the latter is not liable, although the contract be signed by him, for and on account of the foreign principal."

These principles are unqualifiedly sanctioned by respectable authority of other States of the Union; and in connection with the second proposition advanced by plaintiffs, they have been followed in several cases by our own Court. 33 Howard U. S. R. 49, Oelricks vs. Ford; Lyon vs. Williams, 5 Gray, 557; Bray vs. Ketell, 1 Allen (Mass.), 80; New Castle vs. Red River R. R. Co., 1 R. 147; 13 La. 20, Zacharie vs. Nash; 15 La. 306, Nott vs. Papet; 8 Ann. 8, Thorne vs. Tait; 14 Ann. 448, Parlange vs. Faures; Spotts vs. Cowan, 9 Ann. 520.

In our examination of this case we have been guided by the jurisprudence thus established, and we conclude that the case is clearly with the defendants.

In a contract of affreightment such as the one disclosed in this record, we find an apt illustration of the wisdom of the rule that, in determining the question of the presumption as to which of the parties credit is given, which is the vital issue in all such cases, courts must deal with the question of fact in each case, with the question of intention to be ascertained by the terms of the particular contract and the surrounding circumstances.

Now, in this case the record shows that defendants were (like plaintiffs) commission merchants and factors and dealers in cotton; and that as an appendage to their main business they undertook the agency of a line of steamers known and designated as the " Serra Line of Steamers," plying between Liverpool and this port.

The nature of their connection with the steamer " Gracia," for whose account they entered into the contract under discussion, was made known to plaintiffs by the very freight brokers, Dobell & Bell, who negotiated the contract between them and the defendants, and was made manifest to them on the very face and in every line of the bills of lading which were executed by the defendants, formally accepted and at once transferred by endorsement by the plaintiffs as a commercial security.

The heading of the bill contains the words: "Serra Line of Steamers," "Louis Ranger & Co., Agents, New Orleans;" every stipulation

in the bill is made in the name and for the account of the steamer, her commander and owners, and the contract is signed by the defendants as agents.

When, later on, circumstances prevented the literal execution of the contract through the steamer contemplated by the parties, plaintiffs were at once notified of the circumstance, and of the intention of the defendants to make the shipment by another steamer, the "Chancellor," of the "Harrison Line," and were requested to change their insurance accordingly; all of which was accepted without murmur or objection by plaintiffs. And the record further shows that through a "cable" to the managers of the line at Liverpool, the defendants also notified them of the unforeseen disability of the vessel to carry out their contract with plaintiffs, and that the consent of said managers was obtained to operate the change of shipment to the "Chancellor."

When sued in this case, the defendants again reiterated in their answer a statement of their true character in the premises and of their real and legal connection with the contract, and they amplified their previous disclosure of their agency as well as the names of the managing owners of the line of steamers. They therein declared that they were the agents of the "Serra Line, J. T. Nickels & Co., of Liverpool, managing owners," and defendants' principals.

We must hold these acts as a substantial and sufficient compliance with the very rule invoked by plaintiffs themselves, and as affording ample legal and equitable grounds to exonerate the defendants from all personal liability in the premises.

We pretermit any expression of opinion as to the right of plaintiffs to enforce their claim against any other party to the contract, and under the views as herein expressed we eliminate all discussion of the merits of their claims against the steamer "Gracia," or her owners.

The discussion would involve questions of great interest and of attractive study, but it would answer no useful purpose in face of the conclusion which we have reached.

It is, therefore, ordered, adjudged and decreed, that the judgment appealed from be annulled, avoided and reversed; and it is now ordered and decreed that plaintiffs' demand against defendants be rejected, and that their action be dismissed at their costs in both courts.